## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## CLARKSBURG DIVISION

**MONICA ANN SHIFFLETT,**

        **Plaintiff,**

**v.**
                    **Civil Action No.: 1:12-CV-138**
                    **Judge Keeley**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [15], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16], AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.   INTRODUCTION

On September 5, 2012, Plaintiff Monica Ann Shifflett ("Claimant") filed a Complaint *pro se* in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.) On November 19, 2012, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 10; Administrative Record, ECF No.11.) On December 19, 2012 and January 14, 2013, Claimant and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 15; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 16.) Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   BACKGROUND

### A.   *Procedural History*

On October 6, 2008, Claimant protectively filed her first application under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on January 1, 2005. (Tr. 188). This claim was initially denied on January 21, 2009 and was denied again upon reconsideration on April 21, 2009. (Tr. 83, 96). On May 27, 2009, Claimant filed a written request for a hearing (Tr. 105), which was held before United States Administrative Law Judge ("ALJ") Karl Alexander on October 20, 2010 in Morgantown, West Virginia. (Tr. 49). Claimant, represented by counsel, Susan McLaughlin, Esq., appeared and testified, as did Dr. Larry G. Kontosh, an impartial vocational expert. (Tr. 76). On January 12, 2011, a second hearing before ALJ Alexander was held in Morgantown, West Virginia for the purpose of gathering evidence with the use of a medical expert. (Tr. 31, 78). Claimant, represented by counsel, Susan McLaughlin, Esq., appeared and testified, as did James E. Ganoe, an impartial vocational expert. (Tr. 33). Thomas F. Scott, MD, an impartial medical expert, was present by telephone and testified. (Tr. 33). On March 15, 2011, the ALJ issued an unfavorable decision to Claimant, finding that she was not disabled within the meaning of the Social Security Act. (Tr. 7). On October 10, 2012, the Appeals Council denied Claimant's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1).

### B.   *Personal History*

Claimant was born on October 16, 1975, and was thirty-two years old at the time she filed her first SSI claim. (Tr. 23). Under the regulations, Claimant was considered a "younger individual" and, generally, one whose age will not "seriously affect [Claimant's] ability to adjust

to other work." 20 C.F.R. §§ 404.15639(c), 416.963(c).  Claimant has a high school diploma. (Tr. 54).  Claimant has prior work experience as an owner of a pizza shop.  (Tr. 54).  Additionally, she has worked at a chiropractor's office, she has worked at Dairy Queen and she has worked in retail at Walmart and Gabriel Brothers.  (Tr. 54).  Claimant was not married at the time she filed her initial claim.  (Tr. 182).  Furthermore, Claimant does not have dependent children.  (Tr. 182).  Both of her parents are living, and she is an only child.  (Tr. 318).  Claimant uses alcohol occasionally and smokes anywhere from a third of a pack to one and half packs of cigarettes per day.  (Tr. 309, 394).

*C.*     *Medical History*

###### 1.     Medical History Pre-Dating Alleged Onset Date of January 1, 2005

On September 14, 2004, after presenting at the Emergency Room at Preston Memorial Hospital in Kingwood, West Virginia, Claimant underwent a surgical procedure.  (Tr. 303).  A paracervical block was performed, as was a cervical block.  (Tr. 303).  A loop electrosurgical excision procedure (LEEP) was performed and then ball cautery was performed on the LEEP bed with good hemostasis.  (Tr. 303).  The surgeon, Michael Parsons, M.D., noted Claimant "tolerated this well and was discharged home in good condition".  (Tr. 303).  A specimen was taken from her cervix and a cervical biopsy was performed.  (Tr. 304).  Her final pathologic diagnosis from that specimen was moderate to severe squamous sysplasia with associated condylomatous change and chronic cervictis with extensive squamous metaplasia.  (Tr. 304).

###### 2.     Medical History Post-Dating Alleged Onset Date of January 1, 2005

On April 12, 2005, Claimant underwent a gynecologic cytology as a screening test for cervical cancer performed by Dr. Parsons.  (Tr. 305).  According to her cytopahology report, her endocervical/squamous metaplastic cells were negative for the cells of intraepithelial lesion or

malignancy.

On July 11, 2007, Claimant visited the Emergency Room at Preston Memorial Hospital with a chief complaint of neck and back pain. (Tr. 307). Claimant reported experiencing "pain radiating down [her] neck into [her] arm into [her] small finger on [the] right side". (Tr. 309). She opined her pain was a "9" on a scale of 1 to 10. (Tr. 309). Claimant stated rotating her head to the right or tilting her head caused her more pain. (Tr. 309). She did not use a wheelchair as her mode of arrival to the Emergency Room was ambulatory. (Tr. 309). After a physical exam was performed and X-rays of her cervical spine were taken, her diagnosis was listed as osteo arthritis of the cervical spine. (Tr. 308). Claimant's physical examination revealed limited mobility in her neck and limited rotation to the right. (Tr. 308). Additionally, it revealed no objective finding of being neuro deficient. (Tr. 308). Claimant's X-ray impressions revealed mild degenerative disc change at C5-6 and C6-7 and a mildly kyphotic cervical spine. (Tr. 312).

On December 10, 2007, Claimant was examined at Every Body's Chiropractic[1] in Kingwood, West Virginia by Dr. Stephen Herto. (Tr. 433).

On June 24, 2008[2], Claimant was again examined by Dr. Herto and a report of findings was prepared for her. (Tr. 434-435). Dr. Herto performed a foot scan to see if Claimant's feet could be contributing to her postural imbalances. (Tr. 435). He strongly recommended Claimant follow a treatment program that addressed adjustment to maintain normal joint function of her spine, lower leg, knee and hip through spinal and extremity adjustments, support by wearing custom-made Spinal Pelvic Stabilizers to support the arches in her feet and rehab by beginning a

---

[1]This is where Claimant was employed for six months during 2007. (Tr. 55-56).

[2]Claimant was no longer working at Every Body's Chiropractic at this time. (Tr. 55-56).

course in therapeutic exercise to improve muscle function.  (Tr. 437).

On the afternoon of May 3, 2008, Claimant was admitted to the Emergency Room at Monongalia General Hospital and stayed overnight.  (Tr. 317).  Her arrival at this Emergency Room visit was also ambulatory.  (Tr. 334, 352).  She presented to the Emergency Room with acute onset of abdominal pain with a duration of two hours.  (Tr. 318, 334).  From there, she was triaged and admitted to the attending physician, Rita Payne, MD for a short stay.  (Tr. 356-357).  She reported symptoms of nausea and few vomiting episodes.  (Tr. 334).  She described the pain as being greater in the left side than in the right and she reported her pain to be a "10" on a scale of 1 to 10.  (Tr. 318).  The attending physician did note, however, that Claimant was able to sleep through the night without disturbance.  (Tr. 318).  The next morning (the day she discharged from the hospital), she reported her pain was a "3" or "4" on a scale of 1 to 10.  (Tr. 355).  According to her Adult Admission Assessment from this stay, she had the ability to feed herself, had no eating difficulties and used no adaptive feeding equipment at this time.  (Tr. 392).  According to her Transitional Assessment Form from this stay, her mobility was slightly limited and her activity was described as "walk occasionally".  (Tr. 403).  Her general appearance was described by the attending doctor, Rita Payne, MD as "severe distress".  (Tr. 334).  Her affect was cooperative, although she was crying.  (Tr. 352).  She was alert and oriented to time/place/person.  (Tr. 351).  Her speech was clear.  (Tr. 334).  Her gait was steady.  (Tr. 334).  She reported no history of falls.  (Tr. 353).  She was diagnosed with abdominal pain and leuko cytosis.  (Tr. 312, 318).  Claimant's impression was "pelvic and abdominal pain with leukocytosis with the pain now resolving".  (Tr. 319).  A CT scan revealed a 4 cm right ovarian cyst.  (Tr. 427, 432).  She was given intravenous antibiotics in the hospital and, upon discharge,

was ordered to follow up the next week, on May 8, 2008. (Tr. 319, 355, 359).

On September 18, 2008, Claimant was seen at the Emergency Room at Monongalia General Hospital for another overnight stay. (Tr. 438, 450-451). Claimant's arrival mode for this visit was ambulatory. (Tr. 447, 461). She was seen by attending physician Jeffrey B. Sinclair, MD. (Tr. 448). Claimant had complaints of back pain and upper back and neck pain for eight months. (Tr. 447). She denied any recent injury to her neck and said the onset was gradual. (Tr. 447). She reported that she had been treated by a chiropractor for pain, but that she had to stop due to financial reasons. (Tr. 462). She opined her pain intensity was an "8" on a scale of 1 to 10. Dr. Sinclair characterized the character of her pain as moderate and the function limitation as minimal. (Tr. 447). Claimant's general appearance was listed as "mild distress" and her gait was described as "within normal limits". (Tr. 448). She reported no history of falls. (Tr. 461). A physical examination revealed she had bilateral thoracic tenderness and decreased ROM in her back. (Tr. 448). Her diagnosis was acute and chronic upper back pain. (Tr. 448). Her condition was listed as improved and she was discharged. (Tr. 448). She was given patient education materials about back sprains and strains and was ordered to follow up within one to two days with Kim Carey in Morgantown, West Virginia. (Tr. 443).

On September 22, 2008, Claimant was seen at Dr. Mitchell's office where she complained of pain in the thoracic area for two months. (Tr. 539). She was scheduled for an MRI of her cervical spine and thoracic spine and ordered to follow up after that was obtained. (Tr. 539).

On September 30, 2008, Claimant again presented at the Emergency Room at Monongalia General Hospital. (Tr. 477). Claimant reported experiencing back pain, right

shoulder pain, headaches, dizziness, neck pain, blurred vision and numbness on the right side. (Tr. 481). Claimant underwent an MRI on her cervical spine and thoracic spine. (Tr. 491). The physician interpreting her MRI results, Cristina M. Cavazos, MD, referred her to the West Virginia University ("WVU") Spine Clinic "ASAP". (Tr. 485). The impression of the MRI of Claimant's cervical spine revealed degenerative disc disease and pondylosis at C5-6 and C6-7 with foraminal narrowing. (Tr. 496). Elsewhere, there was no significant degenerative disc disease or spondylosis. (Tr. 496). The impression of Claimant's thoracic spine revealed an isolated large right disc protrusion at T7-8 with suspected malacic change within the cord and potential compromise of the right T8 and T9 nerve roots. (Tr. 498). The clinical history for the cervical spine was cervical disc disease and for the thoracic spine it was pain. (Tr. 496-497).

On October 3, 2008, Claimant presented at the Emergency Room at Monongalia General Hospital. (Tr. 499). Her arrival mode at this visit was ambulatory. (Tr. 507). Her chief complaint was back pain between her shoulder blades and in her lower neck lasting a month. (Tr. 507). Her general appearance was "within normal limits and no acute distress". (Tr. 508). Her gait was within normal limits. (Tr. 508). She reported no history of falls. (Tr. 522). Claimant was alert and was oriented to time/place/person. (Tr. 523). Her affect was calm, cooperative and appropriate. (Tr. 527). At this time, Claimant's history of the present illness noted "no known injury although [she] states [she] had [a] neck injury remotely from sled riding". (Tr. 507). Claimant was diagnosed with cervical radiculopathy. (Tr. 510). She was seen by attending physician Scott Benson, MD and was ordered to follow up with Dr. Mitchell. (Tr. 500, 503).

On October 5, 2008, Claimant visited Wedgewood Family Practice to go over her MRI

results.  (Tr. 538).  Claimant stated she did not understand her copy of her results, she knew she was referred to the Spine Center and wanted to ask some questions to know what her options were.  (Tr. 538).  She was described as a "healthy-appearing female in obvious discomfort".  (Tr. 538).

On October 22, 2008, she visited the WVU Department of Neurosurgery in Morgantown, West Virginia, where the physician's assistant and doctor evaluated her as consulting physicians to her follow up care from Dr. Mitchell.  (Tr. 542).  She presented for evaluation of her cervical and thoracic MRIs.  (Tr. 541).  Her CT and MRI of her cervical spine and her MRI of her thoracic spine was reviewed.  (Tr. 541).  Her gait was described as "slow, guarded, and steady, not myelopahtic".  (Tr. 541).  The staff, physician's assistant Lindsey Mikeo and Terrence D. Julien, MD, reviewed her natural history and indications for surgery, discussed Claimant's film findings with her and ordered an EMG, CT scan and MRI to obtain further work-up to help localize the pain generators.  (Tr. 542).   The staff noted that as consulting physicians, they would leave any recommendations in regards to medications and work status to Dr. Mitchell's discretion unless surgical intervention was implemented.  (Tr. 542).

On November 1, 2008, Claimant presented at the Ruby Memorial Hospital Emergency Room in Morgantown, West Virginia.  (Tr. 544).  There, Claimant complained of lower back pain that was a "9" on a scale of 1 to 10.  (Tr. 544, 551).  Her general appearance was mild distress and she was alert but had an anxious/depressed level of consciousness.  (Tr. 544).  At this time, she mentioned her previous sled riding accident, mentioning she had a chronic problem since then.  (Tr. 544, 551).  She was given Percocet and ordered to follow up with the Spine Clinic in three days.  (Tr. 548-549).

On November 3, 2008, Dr. Mitchell issued a return to work slip/prescription stating that Claimant was unable to return to work until further notice. (Tr. 543).

On November 26, 2008, Claimant was seen as a follow up in the Neurosurgery Clinic at the WVU Department of Neurosurgery. (Tr. 555). Her gait was steady, and there was no focal weakness of the upper or lower extremities. (Tr. 555). An EMG report from November 25, 2008 was reviewed, and Dr. Julien and Ms. Mikeo wrote it showed a normal study with no right cervical radiculopathy. (Tr. 555). A CT of her cervical spine from November 26, 2008 was reviewed again, showing degenerative changes and sponsylosis in C5-6 and C6-C7. (Tr. 555). A lumbar MRI from November 26, 2008 was reviewed, showing degenerative disk and joint disease. (Tr. 555). Additionally, Claimant's natural history was reviewed. (Tr. 555). It was reported that Claimant's symptoms are diffuse and do not point to one specific pain generator. (Tr. 555). The team did not recommend surgical intervention but did recommend Claimant be seen by the pain clinic and followed up by Dr. Vagilenti for further treatment options. (Tr. 555).

On December 29, 2008, Claimant presented at the Ruby Memorial Hospital Emergency Room. (Tr. 563). Her chief complaint was back pain and she also complained of chest pain. (Tr. 563). She was transported to a CT scan in a cart and given Valium and Toradol (Tr. 565). She underwent a CT angiography of the chest. (Tr. 566). The impression from the CT scan were a small left-sided pleural effusion with associated consolidation likely related to atelectasis, a small amount of dependent atelectasis on the right and no evidence for pulmonary embolus on a limited exam. (Tr. 566). Further, a frontal view of the chest was obtained for an indication of dyspnea and the impression was "no acute cardiopulmonary process". (Tr. 567). She was discharged home and ordered to follow up with her primary care provider in one day. (Tr. 565).

*D.*     *Testimonial Evidence*

**1.     October 20, 2010 ALJ Hearing**

Testimony was taken at the hearing held on October 20, 2012.  The following portions of the testimony are relevant to the disposition of the case:

Claimant testified that from the time she graduated high school in 1993 until 1999 when she opened her own pizza shop, she worked "odd jobs...here and there".  (Tr. 54).  Claimant testified these jobs consisted of working at Dairy Queen, Gabriel Brothers, and working at a different pizza shop for four years before opening her own.  (Tr. 54).  She owned her pizza shop for six years before closing the shop in 2005.  (Tr. 54-55).  Claimant worked part-time for a chiropractor's office for a period of six months in 2007.  (Tr. 55-56).  In late 2008, Claimant worked part-time for Walmart for about two months.  (Tr. 56).  In her positions at the pizza shop she worked at and the one she owned, she lifted heavy items regularly, such as a fifty pound bag of flour and pizza dough which she estimated to weigh around sixty pounds.  (Tr. 54-55).  She took care of the financial matters of the pizza shop by taking care of the "ordering, when the trucks came in" and paying bills when they became due.  (Tr. 55).  The pizza shop also had an accountant who took care of the other paperwork. (Tr. 55).

Claimant testified she is asking to be awarded disability benefits because "she pretty much cannot do anything" as a result of her "condition" relating to pain in her cervical spine, thoracic spine, lumbar spine and right hand.  (Tr. 57-58).  Claimant opined this began during a sled-riding accident when she was seventeen years old.  (Tr. 58).  Claimant testified that she did not break anything in that accident, but that her "spine was completely the opposite direction".  (Tr. 58).  She

was not hospitalized at that time and she was able to return to high school and graduate. (Tr. 58). Claimant did see a chiropractor for this injury and testified the pain slowly got worse from that time in 1993 until "2005 [when she closed the pizza shop] and then it really got bad in 2008 [when she stopped working altogether]". (Tr. 58-59).

Claimant testified the impairment that causes her the most trouble on a day-to-day basis is her thoracic spine, which causes her to feel a stabbing, sharp pain in the middle of her back at all times. (Tr. 62). Claimant testified she was not currently taking any pain medication. (Tr. 62). Additionally, Claimant testified she has pain her neck that is "sharp, cramping, shooting" and shoots down her right arm. (Tr. 63-64). Claimant had difficulty in her right arm taking the oath for the hearing. (Tr. 64). Claimant testified she is unable to use her right arm in a normal way: she is unable to hold items, feed herself with it, or write. (Tr. 64). Claimant testified that if she were to put a pen in her right hand, it would simply fall out and that she must sign her name to documents with her left hand even though she is right handed. (Tr. 64). Additionally, Claimant testified she has lower back pain, which causes her left leg to have shooting pains and to give out on her. (Tr. 69-70). Claimant testified she had pain in her left leg, but that it was not bad until 2008. (Tr. 70). Claimant testified she has difficulty moving her head/neck from side to side and the ALJ noted that she was not turning her head during the hearing. (Tr. 72).

Claimant testified she is unable to dress herself and that her mother assists her with that as her caretaker. (Tr. 64-65). Claimant testified that her mother helps her by helping her out of bed, helping her with her personal hygiene needs and preparing her meals. (Tr. 65). Claimant testified she has trouble feeding herself: that she must eat with her left hand from a tray that comes up to her chest, and even at that height she experiences sharp pains and must move very slowly or else she

misses her mouth.  (Tr. 71-72).  Claimant testified she lives alone but that her mother stays overnight with her about four times per week, and the rest of the time she comes over by 9:30 a.m. every morning to help with her care.  (Tr. 65).  Claimant testified that on the nights her mother does not stay with her, she leaves her in bed, and if at any time during the night she would need to get out of bed, she would have to place an emergency call to her mother to come over for help because she cannot get out of bed on her own.  (Tr. 73-74).

Claimant appeared at the hearing in a wheelchair.  (Tr. 66).  Claimant testified this wheelchair was prescribed to her by her doctor and that she uses it as needed, including while at home.  (Tr. 66).  Claimant testified this was prescribed to her recently, although she had been using one since 2008 when she had multiple falls.  (Tr. 69-70).  Claimant testified she needs help to walk and stand at home – that she cannot stand up on her own, and if someone were to help her stand and then walk into the next room, she could not then walk without assistance.  (Tr. 66-67).  Claimant testified she attended physical therapy sessions three times per week for eight months, but that she had not attended physical therapy for four months prior to the hearing.  (Tr. 67).  Claimant testified she also underwent massage therapy.  (Tr. 67).  Claimant testified both physical therapy and massage therapy caused her to feel worse when she was finished than when she went in.  (Tr. 66-67).


Regarding her daily activities, Claimant testified she doesn't do "mostly anything".  (Tr. 74-75).  Claimant testified that if she watches TV, her concentration breaks and she can't pay attention to "anything".  (Tr. 75).  Claimant testified she used to enjoy dancing, but now cannot do that.  (Tr. 75).  Claimant testified she has not driven a car since early 2008.  (Tr. 68).  Claimant testified she has trouble getting in and out of a car and needs the assistance of one of her parents.  (Tr. 73).

Claimant testified she has not maintained the social contacts she held with people because she doesn't want to be seen the way she is, she does not receive visitors, she does not call her social contacts on the phone and she does not go out of the house, except to go to the doctor. (Tr. 72-73).

The ALJ then solicited testimony from the VE, Dr. Larry G. Kontosh. (Tr. 77). The VE characterized Claimant's previous work as follows: some of per past work is skilled and the rest is semi-skilled, and the range is from light exertional level to medium exertional level. (Tr. 77). The VE testified there are jobs for people in wheelchairs at a sedentary level. (Tr. 77). The VE testified if a claimant did not have full bimanual dexterity, the number of jobs that could be performed in a wheelchair would not be totally eliminated. (Tr. 77).

### 2.      January 12, 2011 ALJ Hearing

Testimony was taken at Claimant's second ALJ hearing held on January 12, 2011. (Tr. 31). The second ALJ hearing was held so that a hearing with a medical expert, Dr. Thomas Scott, could occur. (Tr. 33). The ALJ wanted a hearing with a medical expert to gather more evidence and to determine if objective findings would support the severe limitations Claimant alleged in her first hearing. (Tr. 76). The following portions of the testimony are relevant to the disposition of the case:

Dr. Scott testified that upon his review of the medical exhibits relating to Claimant's physical ailments, he had come up with diagnoses of severe impairments for Claimant. (Tr. 35). Dr. Scott opined that Claimant has cervical radiculopathy and imaging evidence of disc protrusion in her thoracic spine. (Tr. 35). Dr. Scott testified that neither of these conditions meets the listing. (Tr. 36). When asked his opinion on whether Claimant's condition warrants a wheelchair as a medical necessity as far as he could tell from what he's observed without examining Claimant, Dr. Scott testified the only items he found in the record were a doctor offering Claimant a wheelchair and a

copy of a prescription for a wheelchair, but that he did not see any documentation as to the necessity of the wheelchair prescription. (Tr. 36). When asked, Dr. Scott testified based on the medical evidence of the record overall, Claimant would be able to work at the sedentary level with a sit/stand option, could perform the postural movements occasionally, except could not climb ladders, ropes or scaffolds, should not exposed to temperature extremes, wet or humid conditions or hazards. (Tr. 36-37).

On cross-examination by Claimant's counsel, Dr. Scott testified symptoms of the cervical radiculopathy and bulging disc would be pain in her arm and neck. (Tr. 39). Additionally, Dr. Scott testified there would be no way of evaluating how much pain Claimant has [from the record]. (Tr. 39).

Regarding other diagnoses in the record, Dr. Scott testified there was no evidence in the record that would support the diagnosis of mild disc disease from an objective standpoint. (Tr. 37). Additionally, Dr. Scott testified there was no objective medical evidence in the medical record that would support a diagnosis of brachia neuritis/radiculitis. (Tr. 37). Dr. Scott testified that there was a statement of diffuse pathology without the specific generator that he would interpret as a "wide range of various complaints". (Tr. 37-38). Dr. Scott testified he found nothing specifically to be causing those complaints. (Tr. 38).

The ALJ then sought testimony from Claimant as to her wheelchair usage. (Tr. 44). Claimant testified she "just use[s] it when [she] ha[s] to". (Tr. 44). Claimant testified she estimated that occurred about three times per week. (Tr. 44). Claimant further testified that on those three days, sometimes she uses it for the entire day, and other time she only uses it for part of the day. (Tr. 44). Claimant testified she is taking no medications. (Tr. 44).

The ALJ then solicited testimony from the VE, James E. Ganoe. (Tr. 45). The VE characterized Claimant's previous work as follows: work as a fast food cook is a medium exertional level and is skilled; work as a fast food cashier is a light exertional level and is unskilled; work as a food service supervisor is a light exertional level and is skilled; work as a stock clerk is heavy exertional level and is semi-skilled and work as a chiropractic assistant is a medium exertional level and is skilled. (Tr. 46). The VE then testified there were jobs at the national and regional economy for a person with Claimant's limitations, noting that the DOT does not recognize a sit/stand option, however. (Tr. 46-47). Additionally, the VE testified that the person's necessity of using a wheelchair for some portion of the work week would not affect the number of jobs because most of the jobs are sedentary and the individual is allowed to sit 100% of the time. (Tr. 47).

## III.   CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, alleges that:

•   Dr. Scott, the medical expert, testified in the second hearing that there "is no way to evaluate [the] pain level of a bulging disc (herniated disc) and findings were supportive of radiculopathy of [C5-6 and C6-7]";

•   Dr. Scott testified that a specialist in spinal evaluations made findings that would be consistent with chronic pain; and

•   Dr. Scott testified there was not any way to determine Claimant's condition at the time of the ALJ hearing or what an EMG would reveal at that present time.

(Pl.'s Mot. at 1.) Plaintiff did not ask the court for specific recovery. (*Id.*)

Defendant, in his motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1.) Specifically,

Defendant alleges that:

- Substantial evidence supports the ALJ's finding that Claimant could perform the sedentary work the VE identified.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 13.)

## IV.    STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Laws, 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore,

**"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** <u>Blalock v. Richardson,</u> 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

# <u>V.</u>   <u>DISCUSSION</u>

## A.   *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

<u>See</u> 42 U.S.C. § 423(d)(2)(A) (2006).  The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
> 20 C.F.R. §§ 404.1520; 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional

capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

**B.      *Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.     **The claimant meets the insured status requirements of the Social Security Act through March 31, 2006.**

2.     **The claimant has not engaged in substantial gainful activity since January 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).**

3.     **The claimant has the following severe impairments: degenerative disc disease/degenerative arthritis of the thoracic and cervical spine, with cervical radiculopathy; minimal degenerative changes of the lumbar spine; headaches; depression due to physical problems (20 CFR 404.1520 (c) and 416.920(c)).**

4.     **The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

5.     **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with an option to sit or stand; performing all posturals occasionally, except no climbing of ladders, ropes or scaffolds; should have no exposure to temperature extremes, wet/humid conditions or hazards; should work in a low stress environment with no production line or assembly line type of**

pace and no independent decision-making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on October 16, 1975 and was 29 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404 1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-25).

C.     *Analysis of the Administrative Law Judge's Decision*

Claimant contends the expert testimony of Dr. Thomas Scott at her second ALJ hearing in January 2011 shows she is disabled because he: a) agreed with her attorney when questioned that there is no way to evaluate the pain level of a bulging (herniated disc) and findings were supportive of radiculopathy of C5-6 and C6-7; b) testified that Dr. Beyengdo, a specialist in spinal evaluations, made findings that would be consistent with chronic pain; and c) testified there was no way to determine the condition of Claimant at the time of the hearing. (Dkt. No. 15, p. 1).

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

Claimant's argument must fail. Claimant's sole argument in her single-page, handwritten motion for summary judgment is that the medical expert from the second ALJ hearing shows she is disabled. The ALJ took the entire record into consideration, as well as the medical opinions of the state agency physicians and the VE's. (Tr. 23-24). A standard ALJ hearing was held on October 20, 2010, in which the ALJ heard the merits of Claimant's arguments and inquired into Claimant's lifestyle, medical history, and claims of pain. (Tr. 49). A subsequent hearing was ordered "to take medical expert testimony" at the option of the ALJ. (Tr. 10). This supplemental hearing was held January 12, 2011 and lasted thirty-three minutes (Tr. 33, 45). Dr. Thomas Scott, an independent medical expert, was present via telephone. (Tr. 33). Dr. Scott provided supplemental analyses of Claimant's spinal conditions. (Tr. 34). He was asked by the ALJ if there was anything else in the record that supported Claimant's diagnoses, based on his expertise and review of the record. (Tr.

37).  The fact that Dr. Scott agreed with Claimant's attorney when questioned that there is no way to evaluate the pain level of a herniated disk does not equal substantial evidence to reverse the ALJ's overall conclusion from the record that Claimant's impairment or combination of impairments do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 13).  Similarly, the fact that Dr. Scott testified that the specialist in spinal evaluations made findings that would be consistent with chronic pain also does not equal substantial evidence to reverse the ALJ's overall conclusion.  The fact that Claimant experiences chronic pain was not contested, in fact, Dr. Scott his diagnosis based off of his review of the record was that Claimant has cervical radiculopathy and imaging evidence of a disc protrusion in the thoracic spine.  (Tr. 35).

Finally, the fact that Dr. Scott testified there is not any way to determine that condition of Claimant at the time of the hearing or what an EMG would reveal at the date of the hearing does not equal substantial evidence to overturn the ALJ's conclusion.  The medical expert was simply testifying at the second hearing based off a review of the record, not an examination of Claimant. This statement involving what an EMG would show today was in response to cross examination about an EMG that was done in 2008.  (Tr. 41).  The hearing involved questioning by all parties involving various entries in the medical record from 2008 and other years, taking the record as a whole. (Tr. 36-40).  Additionally, the ALJ devoted nine pages to his analysis of the medical record as a whole, citing numerous examples from 2008 in his determination that Claimant does not have an impairment that equals a listed requirement.  (Tr. 13-22).  The ALJ stated that Dr. Scott's review of the record (as a whole) caused him to determine that Claimant would be capable of performing work within the limitations of the residual functional capacity set forth in the ALJ decision and that the ALJ accepted that determination.  (Tr. 23).  In addition, the ALJ also took into consideration and

accepted the opinions of the state agency physicians and consultants that Claimant is not disabled and is able to perform work related activities. (Tr. 23). The ALJ stated, "the above residual functional capacity assessment is supported by the reports of the claimant's treating physician's, the medical evidence of record and the record in its entirety." (Tr. 23). In sum, this Court finds substantial evidence supports the ALJ's determination that Claimant is not disabled.

## VI.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 15) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 16) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and

Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 5th day of March, 2013.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE